**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jo Ann Probst, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. |
| County of York, | : | |
| Matthew Hobson (in his individual | : | |
| capacity), | : | |
| and Christopher Lorenzen (in his | : | |
| individual capacity), | : | |
| Defendants. | : | Jury Trial Demanded |

**COMPLAINT**

## I. INTRODUCTION

Jo Ann Probst (Hereinafter "Probst") was one of two lesbian women fired by York County (Hereinafter 'County') following their reports of a hostile work environment based on sex in York County Department of Emergency Services 911 Center (Hereinafter "Center") in the summer of 2021 to an investigator. Following their reports, the investigator provided the investigative report and supporting information to the York County Commissioners, who in turn shared the report with Matthew Hobson (Hereinafter "Hobson"), the Director of the Center. Hobson then shared information about the investigative report, including Probst's participation in the investigation with Christopher Lorenzen (Hereinafter "Lorenzen"), the Deputy Director of the Center. Following the receipt of the investigative report, Hobson and Lorenzen engaged in a series of acts that negatively impacted Probst's

work environment, including removing her from leadership roles, changing her schedule at the last minute, refusing to allow her to exercise her right to previously scheduled time off for important doctor appointments, and finally firing her for actions she did not commit and that another non-homosexual employee, who had not engaged in protected activity, actually committed. Probst was a 29 (twenty-nine) year employee of the County. As a result of this unjust termination Probst suffered lost earning capacity, lost pay, compensatory damages, and emotional distress. Probst seeks remedies for the harm she suffered and any other relief this Court deems appropriate.

## I.  LEGAL BASIS FOR THIS COMPLAINT

1.  Plaintiff, Jo Ann Probst, brings this action for employment discrimination to secure relief, legal and equitable, for discrimination on the basis of sex and retaliation in violation of rights secured to her Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*

2.  Plaintiff, Jo Ann Probst, brings this action for employment discrimination to secure relief, legal and equitable, on the basis of sex and retaliation in violation of rights secured to her under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951 *et seq*. (PHRA)

## II. JURISDICTION

3.     The jurisdiction of this Court over Count I of this controversy is based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331 in that this district court has original jurisdiction of all civil actions arising under the laws of the United States.   The federal law to be enforced in Count I arises under the provisions of the Title VII.

4.     The jurisdiction of this Court over Counts II, III, IV of this controversy are based upon supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). Plaintiff's claim under Counts II, III, and IV are to be enforced under the PHRA. The laws of the Commonwealth of Pennsylvania apply to Counts II, III, and IV.

## III. VENUE

5.     Venue is appropriate in this district pursuant to §28 U.S.C. § 1391(b) in that Defendants' principal place of business is located in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## IV. PARTIES

6.     The Plaintiff is Probst, who resides in York County, Pennsylvania.

7.     Defendant, County of York, is a municipality in Pennsylvania located in the Middle District of Pennsylvania.

8.   Defendant Hobson is the Center Director and an employee of Defendant York County.

9.   Defendant Lorenzen is the Center Deputy Director and an employee of Defendant York County.

## V.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.   Probst exhausted applicable administrative remedies.

11.   Probst filed an employment discrimination charge against Defendant, York County, with the Equal Employment Opportunity Commission ("EEOC") on July 26, 2022, which was docketed as Charge No. 530-2022-05758.

12.   Probst received a notice of suit rights from the Department of Justice on November 6, 2023.

13.   Probst simultaneously dual filed with the Pennsylvania Human Relations Commission ("PHRC") when she submitted her EEOC Charge on July 26, 2022.

## VI.   DAMAGES AND AMOUNT IN CONTROVERSY

14.   Probst prepared a prefiling demand for the Defendants and the amount demanded far exceeds $150,000.

15.   On January 12, 2023, Probst served the prefiling demand that provided Defendants with the basis for her demand in excess of $150,000 for all the Defendants.

16.    Defendants never responded to the prefiling demand with an offer of settlement.

**VII.**    FACTUAL ALLEGATIONS

**The Employment History of Probst, Hobson, and Lorenzen.**

17.    Probst is a lesbian and married to her wife in York County, Pennsylvania.

18.    York County hired Probst in 1994 as a 911 dispatcher.

19.    York County promoted Probst to 911 Floor Supervisor in 2005.

20.    York County promoted Probst to Lead 911 Floor Supervisor in 2017.

21.    York County hired Defendant Hobson as the County 911 Center Director in 2021.

22.    York County promoted Defendant Lorensen as the County 911 Center Deputy Director in 2021.

23.    York County promoted Probst to Operations Manager in 2021.

24.    York County has a progressive discipline policy that is used by County Center Management for disciplining employees.

25.    In accordance  with the Collective Bargaining Agreement between the County and the Unionized employees, before engaging in any progressive discipline, a manager must provide notice to the employee of the need for change

26. York County Center uses quality assurance software called AQUA, that allows limited personnel to access detailed call information on emergency response calls.

27. The quality assurance (Hereinafter "QA") reports from the AQUA system were a result of inputting the recording of the dispatcher's conversation with the emergency caller, and the transcript of the call.

28. The QA system syncs the voice recording with the transcript and actions taken by the dispatcher.

29. The score reflects timing, accuracy, and tone of the dispatcher on the call.

30. Once the QA team identifies an issue with a dispatcher failing to meet a score on a call, the information is fed into a tracker for follow up by supervisor and training personnel in the department.

31. The AQUA QA reports are files that are accessible to those who are certified in AQUA.

**Probst observes bullying based on sexual orientation and gender identity.**

32. Between April 20 and 30, 2021, while walking on the 911 dispatch floor, Probst saw a dispatcher showing pictures on her cell phone to other Center employees.

33. The dispatcher was showing her co-workers photos of the Center Training Supervisor, Rebecca Conners' (Hereinafter "Conners") transgender partner.

34.   On April 25, 2021, Probst received a call from Conners, who complained about her co-worker's berating treatment of her relating to her relationship with her transgender partner.

35.   Conners reported Shift Supervisor Noah Myers (Hereinafter "Myers") knew about the berating behavior and did nothing to stop it.

36.   Probst responded by requesting Conners file a complaint by sending an email describing the berating and humiliating events so Probst could start an investigation.

**Probst reports the hostile work environment to Lorenzen and Human Resources Agent Ashli Stroud**

37.   Probst reported her findings to Deputy Director Lorenzen, Director Hobson, Operations Manager Andrew Walsh (Hereinafter "Walsh"), and Human Resource agent, Ashli Stroud (Hereinafter "Stroud").

38.   Probst recommended discipline for those involved in the berating and humiliating behavior, and specifically recommended discipline for her subordinate, Myers, because of his failure to stop the harassing behavior.

39.   Probst is not aware of any discipline issued for the events of April 2021 that Center workers treatment of Conners.

**Probst reports the hostile work environment to Human Resources**

**Deputy Director Trout.**

40.   In June 2021, Probst met with Human Resources Deputy Director Tiffany Trout (Hereinafter "Trout") and reported the hostile work environment at the Center.

41.   Probst also reported her belief that Director Hobson disliked females in authoritative positions.

42.   Probst also reported her observations that Director Hobson treated Probst with dislike, which she attributed to her being both female and a Lesbian.

43.   Probst explained that she observed Hobson's favoritism towards the Center Project Manager, Scott Keener (Hereinafter "Keener").

44.   Probst reported to Trout that Commissioner Ron Smith (Hereinafter "Smith") commented negatively about Probst's Catholic faith and religion.

45.   Probst described the interaction she had with Smith where he laughed out loud and told Probst there is no way she was Catholic, at least not a practicing Catholic with her lifestyle.

46.   Probst found this statement offensive and made her very uncomfortable around Smith.

47.   Probst also reported Smith stated there are "too many women in charge at the 911 center which causes nothing but problems."

48.  After the June 2021 report, Trout told Probst she would be called to provide detailed information to an investigator relating to the complaints she made to Trout about the hostile and unfair work conditions at the Center.

49.  Trout specifically referred to the Center management as "Hobson's good old boys club."

50.  Trout told Probst speaking to the investigator is a good thing, as it will allow the Human Resource department to terminate Hobson.

51.  Trout also told Probst after she provided information to the investigator, she should inform Trout if Hobson retaliates against Probst.

**Probst begins to see she is treated more negatively than men at the Center.**

52.  On June 28, 2021, Walsh sent Hobson an email reporting Project Manager Keener for using the York County Radio system for unprofessional and unnecessary transmission and not following the proper chain of command.

53.  June 30, 2021, Hobson replied to Walsh indicating that he had a conversation with Keener.

54.  Probst sent emails with almost identical infractions and complaints to Hobson on September 9, 2020, and December 7, 2020, reporting Keener; however, Hobson never acknowledged or responded to Probst reports.

**Probst meets with the workplace investigator.**

55. On July 14, 2021, Probst met with the investigator and reported the Training Supervisor Karen Murphy used the word "n****r" while on the dispatch floor.

56. Probst reported that since Hobson started as Director of the Center, the atmosphere was like a "good old boys club."

57. Probst provided the investigator with examples of the ways Hobson discriminated against her based on being female.

58. Probst told the investigator about Myers having permission from Hobson to have a portable radio at his home, where no other shift supervisor was ever allowed this privilege.

59. Probst informed the investigator that she asked Hobson about having a portable radio, but Hobson turned down her request.

60. Probst noted to the investigator that Probst is Myers' boss.

61. Probst told the investigator that she felt Hobson treated her differently because of her sex, and because she is married to a woman.

62. Probst informed the investigator that she felt Hobson would deliberately go out of this way to avoid having to speak with her.

63. Probst reported that Hobson frequently talked to Myers, Keener, and Smith, all men, and did not include her in their conversations, even though she held

a high-level management position, and she was near them while they had these conversations.

64. Probst reported to the investigator that Smith stops by and brings Hobson coffee nearly twice a day.

65. She also reported that she heard Smith comment several times that he would never let anything happen to Hobson. He would step in front of whatever it is to protect him at all costs.

66. Probst offered as another example of the inequitable treatment, Hobson's refusal to allow Probst to flex her hours for a doctor's appointment.

67. This inequitable treatment also ruined Probst perfect attendance record.

68. Furthermore, County Center Department Scheduler Rob Morgan (Hereinafter "Morgan") later told Probst that Hobson told him to mark Probst's time out of the office as unpaid.

69. Others in the Center were allowed to flex their hours for doctor's appointments.

70. Probst told the investigator that Hobson accused her of not working hard enough in front of other Center employees when he stated, "Jo are you planning on helping out or picking up any hours like everyone else"?

71. Probst answered Hobson that she had picked up an extra entire week of shifts, more than anyone else in the room.

72.   Hobson looked at Morgan who stated that Probst was correct, she did pick up a lot of shifts.

73.   Hobson's face was visibly red and shortly after stepped out of the room.

74.   Probst reported to the investigator that Hobson was named in an EEOC complaint filed in his former position at the 911 center in Baton Rouge.

75.   Probst reiterated that she believed Hobson was not interested in diversity, did not like females, and did not like gays.

76.   Regarding Hobson's dislike of gays, Probst described events involving Conners initial employment at the Center, where Hobson refused to place her in the Training/QA Manager or Lead Training Supervisor and instead placed her in the position of Shift Supervisor, even though Conners was more than qualified for the Manager and Lead positions.

77.   Probst gave the investigator a folder of complaints that were sent to her by employees who were victims of bullying, a hostile work environment, and harassment.

**Defendant Center IT Worker, Travis, sees Probst reporting to Investigator.**

78.   Although the meeting with the investigator was set up at an off-site location for privacy and confidentiality, the Center IT employee named Travis walked into the room.

79.     Travis had a surprised look on his face when he saw all the information and documents spread out on the table.

80.     The investigator attempted to get Travis to leave, but ultimately instructed Probst to gather all of her papers and move to another room.

81.     Probst expressed her concern to the investigator about Travis seeing her with the investigator and the many documents on the table.

82.     Probst told the investigator she was certain Travis would disclose the information he saw.

83.     Probst was upset and scared after this, since her private, confidential meeting had been exposed.

**Trout confirms Probst provided helpful information to the investigator.**

84.     On July 18, 2021, Probst sent a text to Trout, telling her she spoke with the investigator for 3 hours and 45 minutes.

85.     Trout responded that the investigator stated Probst gave him lots of good information.

**Defendants start retaliatory adverse actions following Probst's report to the County investigator.**

86.     On September 21, 2021, Lorenzen reduced Probst access privileges in Agency 360 and wouldn't provide a reason for his action.

87.     Probst repeatedly requested to have her access back, but it was denied.

88.   On September 21, 2021, Hobson informed Probst that she is no longer allowed to respond to any Union emails, which she had done in the past.

89.   On October 5, 2021, Probst reported to Lorenzen's office where County Human Resource Director Kim Rinker (Hereinafter "Rinker") was present and began questioning Probst about allegations against her.

90.   After the October 5, 2021, meeting Probst suspected these adverse actions were related to Hobson and Lorenzen's knowledge of Probst's report to the investigator.

91.   On October 8, 2021, Lorenzen informed Probst that starting November 1, 2021, he was changing her schedule.

92.   Probst pleaded with Lorenzen not to change her schedule so suddenly, since she had already scheduled medical appointments, which she waited a long time to get due to Covid.

93.   Later that day on October 8, 2021, Probst sent an email to Lorenzen and copied in Hobson informing them that in the absence of a valid explanation for changing her schedule abruptly without any forenotice, she viewed the schedule change as retaliatory discrimination, and she would be contacting York Human Resources Department.

94.   Neither Lorenzen or Hobson responded to Probst's allegations.

95.   On November 1, 2021, Lorenzen informed Probst she had texted Conners for work related information while she was not at work, which required him to have Conners enter that time into her time sheet.

96.   Lorenzen instructed her not to text work related text to others not working.

97.   Probst told Lorenzen that she felt he was not being fair.

98.   Probst asked Lorenzen if he was requiring others to do this or just she and Conners.

99.   Lorenzen did not respond to Probst allegation.

100.   On November 4, 2021, Hobson removed Probst from the Policy Review Committee.

101.   Probst was on vacation from November 8-30, 2021.

102.   On December 1, 2021, this was Probst's scheduled day off, however she had prior permission from Lorenzen to train the new shift supervisor, Rebecca Williams (Hereinafter "Williams").

103.   Lorenzen told Probst she didn't have permission, and consequently the time she worked with Williams was considered unapproved overtime.

104.   Probst reminded Lorenzen about the conversation they had the previous day, but Lorenzen told Probst she didn't have his permission and she should leave.

105.   On December 4, 2021, Probst sent Hobson and Lorenzen an email regarding Center Dispatcher Angie Eads (Hereinafter "Eads") giving her two-week notice.

106.   On December 27, 2021, Lorenzen informed Probst that she was no longer allowed to send employee separation notices out.

**Lorenzen directed Stonesifer to monitor and train Eads.**

107.   The 911 call taking certification checklist (Hereinafter "certification"), is usually signed by the CTO, Training Supervisor, the Operations Manager, and the Deputy Director, as it is required before a call taker can start taking 911 calls on their own.

108.   Lorenzen directed the CTO Conners to sign off on Eads' 911 call taking certification, but she refused because she did not believe Eads was ready for independent 911 call taking.

109.   Lorenzen directed Jeremy Stonesifer (Hereinafter "Stonesifer"), the Quality Assurance specialist, to sign Eads' 911 certification, which he did.

110.   The Center policy does not authorize a Quality Assurance Specialist to sign 911 certifications.

111.   Authorizing a certification for a 911 call taker who is not properly trained is dangerous and contrary to Center policy.

**On December 30, 2021, Lorenzen signs Eads 911 Call Taker Certificate**

112.  On December 30, 2021, Lorenzen signed the 911 certificate and directed Stonesifer to sit on the dispatch floor and monitor and train Eads as she answered live 911 calls.

113.  Stonesifer would pull her 911 calls and go over the ones Eads had questions about.

114.  Stonesifer reported to Lorenzen about the 911 calls he pulled and reviewed with Eads.

115.  Stonesifer completed Daily Observation Reports (Hereinafter "DORs"), which is part of the Agency 360 training software program.

116.  A Certified Training Officer usually completes the DORs.

117.  Stonesifer was not certified to train or fill out DOR reports, not quality assurance.

118.  Stonesifer was operating outside of his capacity at Lorenzen's direction.

**Lorenzen Removes Probst from her Supervisory Disciplinary Responsibilities**

119.  On January 10, 2022, after organizing the electronic discipline files, Probst was told by Lorenzen she was no longer able to touch them unless specifically told to do so by him.

120.  On January 11, 2022, Lorenzen removed Probst from the entire disciplinary and investigative process, (911 Progressive Discipline system).

**Center Shift Supervisors who report to Probst requested assistance regarding call receiver Eads.**

121. On January 16, 2022, Probst's shift supervisors requested a consultation with her regarding the performance issues of dispatcher Eads.

122. Eads did not meet the Emergency Response Industry Standard.

123. One example of Eads failing to meet the Emergency Response Industry Standards included mischaracterizing a call as a domestic violence call, when in fact it was a lost dog call.

124. Another example of Eads failing to meet the Emergency Response Industry Standards included failing to stay on the line with a caller until the police arrived at the domestic violence call.

125. According to Myers and Williams, allowing Eads to continue working as a call taker fielding live 911 calls was a liability to the county.

126. Myers encouraged Probst to send the documentation to Lorenzen and recommend revocation of her call taking.

127. Shift Supervisor Williams informed Probst that in the past 14 days, they had to go over 10 calls that dispatcher Eads incorrectly processed.

128. After meeting with Myers and Williams, Probst assured them she would email Lorenzen and voice their position.

129. Myers, Williams, and Probst collectively agreed that pulling dispatcher Eads now and getting her additional training would be the correct path for everyone involved, including Eads.

130. Probst sent Lorenzen an email about Eads and the collective recommendation that Eads be removed from live 911 calls.

**Lorenzen directs Probst to place Eads on progressive discipline.**

131. Lorenzen had removed Probst from the 911 Disciplinary Systems on January 11, 2022, but on January 19, 2022 via email Lorenzen directed Probst to place Eads on progressive discipline.

132. Lorenzen had removed Probst from the 911 Disciplinary Systems on January 11, 2022, but on January 24, 2022, during a one-on-one supervisory meeting between Lorenzen and Probst they discussed Eads's performance.

133. Lorenzen suggested Probst review Eads files in AQUA.

134. Probst told Lorenzen she did not have access to AQUA.

135. Probst did not want to place Eads on progressive discipline, but preferred training Eads to better perform her job as a call taker.

136. On January 24, 2022, York County allegedly discovered information about either Conners requesting the Eads' AQUA files.

137. The County alleged there were 400 AQUA files in a folder found on Conner's computer titled "Jo-Angie Eads".

**Center holds leadership meeting and discusses Probst's inability to review files in AQUA.**

138. On January 25, 2022, there was a leadership meeting where Center Management discussed the AQUA program.

139. At the meeting January 25, 2022, leadership meeting Probst made it clear that she could not access the AQUA program.

140. Conners was present at the leadership meeting but did not say anything about pulling the AQUA reports or that she was told to do so the day before.

141. Probst reported at the meeting that she wanted to have some access to AQUA so she could get recertified.

**County accuses Probst of targeting Eads and terminates her.**

142. On February 2, 2022, Rinker and Morgan met with Probst and informed Probst they were investigating allegations that she targeted Eads for negative treatment.

143. Rinker said there was a file folder saved in AQUA that is titled "Jo-Angie Eads".

144. Rinker stated there were over 400 files saved in the folder marked "Jo-Angie Eads."

145. Rinker further informed Probst that the person who pulled the AQUA files was Stonesifer, a Quality Assurance worker with access to AQUA.

146. On information and belief, Stonesifer is a heterosexual male.

147. On information and belief, Stonesifer is a gender conforming male.

148. Probst told Morgan and Rinker that she never put her name on a file in the system like that.

149. Probst further explained that the fact that the file was allegedly saved in the AQUA system for Probst's benefit makes no sense, since she didn't have a login to access the system.

150. Rinker stated that during the investigation, Conners reported she created the file because Probst asked her to create it.

151. Rinker indicated that the County considered this targeting an employee.

152. Rinker stated that the complaint was not filed by Eads.

153. Rinker refused to disclose who made the complaint.

154. Rinker initially claimed there were 400 plus files in the folder.

155. During the meeting Probst was repeatedly asked if she told Conners to have Stonesifer pull over 400 AQUA QA files on Eads' 911 calls.

156. Probst repeatedly stated that she did not request AQUA QA files, nor did she request any review of AQUA QA files relating to 911 calls taken by Eads.

157. Probst also asked if she could inspect the 400 files so she could understand what she was being accused of doing.

158. Rinker refused to allow Probst to review the 400 files or the folder where they saved.

159. February 2, 2022, Rinker told Probst to take down her Rainbow Flag hanging inside of her office.

160. On February 7, 2022, there was a 2nd meeting with Rinker and Morgan in reference to the Investigation about allegedly targeting Eads (the meeting lasted less than 5 minutes).

161. On February 11, 2022, the County terminated Probst.

162. At the termination meeting, Rinker stated the number of AQUA QA files in the folder marked "Jo-Angie Eads" was 579, not 400.

163. All the either 400 or 579 alleged 911 calls in the AQUA folder marked "Jo-Angie Eads" would have been accomplished between December 30, 2021 and January 24, 2022.

164. This volume of files of 911 calls would have averaged 16 to 23 calls per day if Eads had worked as a call taker every between December 30, 2021 and January 24, 2022.

165. The volume of 911 calls taken in the 25-day time period that were allegedly found in the file folder marked "Jo-Angie Eads," is not realistic and not likely possible for one call taker.

**Probst files EEOC Charge and Federal Investigator hold a**

**Factfinding Hearing.**

166.  Following Probst filing of the EEOC Charge, the Federal Investigator requested a Fact-Finding Hearing.

167.  Defendant Hobson was present at the Fact-Finding Hearing.

168.  Defendant Hobson admitted he was aware of Probst report to the investigator in July 2021.

169.  Defendant Hobson admitted he did not discipline the employee who actually gathered the 400 files on Eads.

170.  Defendant Hobson admitted he did not have proof that Probst directed the folder relating to Eads to be created and placed on Conners computer.

171.  It is highly unlikely one dispatcher could make 400 911 calls in a twenty-four-day period.

172.  On information and belief, all the years of Probst's employment with the Center, no one had ever been disciplined for pulling too many AQUA QA files in the quality assurance system.

173.  There is no proof that anything was done with any alleged pull files.

174.  Probst asked not to be fired but to allow her to resign to reduce the stigma of the unfair event of unjustified termination.

175.   Probst asked not to be fired but to allow her to resign to reduce the risk of losing her county pension.

176.   Hobson refused this request.

**VIII.   CAUSES OF ACTION**

<u>**COUNT ONE**</u>
York County's violation of Title VII of the Civil Rights Act of 1964.
U.S.C. § 2000e-3(a), *et seq.*

177.   Probst incorporates by reference paragraphs 1 through the present.

178.   Defendant's unlawful retaliation and discriminatory termination of Probst's employment because of her reports of a hostile work environment justifies an award, *inter alia*, of back pay, front pay, benefits and compensatory damages against Defendant.

179.   Defendant's unlawful discriminatory termination of Probst's employment because of her sexual orientation justifies an award, *inter alia*, of back pay, front pay, benefits, and compensatory damages against Defendant.

<u>**COUNT TWO**</u>
York County's violation of the Pennsylvania Human Relations Act
43 a. C.S.A. § 951 *et seq.*

180.   Probst incorporates by reference paragraphs 1 through the present.

181.   Defendant's unlawful retaliation and discriminatory termination of Probst's employment because of her reports of a hostile work environment justifies

an award, *inter alia*, of back pay, front pay, benefits and compensatory damages against Defendant.

182. Defendant's unlawful discriminatory termination of Probst's employment because of her sexual orientation justifies an award, *inter alia*, of back pay, front pay, benefits, and compensatory damages against Defendant.

## COUNT THREE
Matthew Hobson's violation of the Pennsylvania Human Relations Act
43 a. C.S.A. § 951 *et seq*.

183. Probst incorporates by reference paragraphs 1 through the present.

184. Hobson's unlawful aiding and abetting in retaliation and discriminatory termination of Probst's employment because of her reports of a hostile work environment justifies an award, *inter alia*, of back pay, front pay, benefits and compensatory damages against Hobson.

185. Hobson's unlawful aiding and abetting in unlawful discriminatory termination of Probst's employment because of her sexual orientation justifies an award, *inter alia*, of back pay, front pay, benefits, and compensatory damages against Hobson.

## COUNT FOUR
Chrostopher Lorenzen's violation of the Pennsylvania Human Relations Act
43 Pa. C.S.A. § 951 *et seq*.

186. Probst incorporates by reference paragraphs 1 through the present.

187. Lorenzen's unlawful aiding and abetting in unlawful retaliation and discriminatory termination of Probst's employment because of her reports of a hostile work environment justifies an award, *inter alia*, of back pay, front pay, benefits, and compensatory damages against Lorenzen.

188. Lorenzen's unlawful discriminatory termination of Probst's employment because of her sexual orientation justifies an award, *inter alia*, of back pay, front pay, benefits, and compensatory damages against Lorenzen.

**WHEREFORE**, Plaintiff respectfully prays for judgment against the Defendants as follows:

189. For a declaratory judgment that Defendant York County's actions complained of herein violate Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act.

190. For a money judgment including monetary damages exceeding $150,000 representing compensatory damages and all compensation and monetary loses, which Probst has been denied, including back pay, front pay and all other sums of money, including retirement benefits, other employment benefits against all Defendants.

191. For pre-judgment interest against all Defendants.

192. For an award for the negative tax consequences of any judgment received against all Defendants.

193. For reasonable attorneys' fees, expert witness fees, costs and all other relief permitted by the Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act against all Defendants.

194. For such other relief as the Court deems just and appropriate against all Defendants.

Respectfully submitted,
**TRIQUETRA LAW**

Dated: December 21, 2023

s/Sharon R. López
Sharon R. López, PA ID 70605
Attorney for Plaintiff Jo Ann Probst
35 East Orange Street, Suite 301
Lancaster, PA  17602
(717)  299-6300 (Telephone)
(717)  299-6300 (Fax)
Lopez@TriquetraLaw.com